# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| LESEDI TOUSSAINT, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CARE.COM, INC., SHEILA LIRIO MARCELO, and MICHAEL ECHENBERG,<br><br>Defendants. | No. 1:19-cv-10628-DJC<br><br>**First Amended Class Action Complaint for Violations of the Federal Securities Laws**<br><br>*Jury Trial Demanded* |

Lead Plaintiff Lesedi Toussaint ("Lead Plaintiff"), by and through his attorneys, alleges upon personal knowledge as to himself, and upon information and belief as to all other matters, based upon the investigation conducted by and through his attorneys, which included, among other things, a review of documents filed by Defendants (as defined below) with the United States Securities and Exchange Commission (the "SEC"), news reports, press releases issued by Defendants, interviews with confidential witnesses who have personal knowledge of the allegations contained herein, and review of other publicly available information, as follows:

## Summary of the Action

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Defendant Care.com, Inc. ("Care.com" or the "Company") common stock between May 23, 2016 and April 2, 2019, inclusive (the "Class Period"). This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2.     Care.com describes itself as "the world's largest online marketplace for finding and managing family care." 2018 Form 10-K at 3. It describes its mission as helping "families make informed decisions in one of the most important and highly considered aspects of their family life— finding and managing quality care for their family, their children, parents, pets and other loved ones." *Id.*

3.     The Class Period begins on May 23, 2016 when Defendant Sheila Lirio Marcelo, Founder, President, and CEO of Care.com, said at a JP Morgan Media, Technology and Telecom Conference "We have . . . about 7 million caregivers that we have vetted . . . . [W]e continue to invest [in safety] and it has been the baseline product from day one, [we have] invested in background checking that include[s] national criminal record [and] sexual offender registry."

4.     Care.com repeatedly distinguished itself from other websites such as Craigslist, which it characterized as unsafe. In contrasting itself with Craigslist, Care.com purported to "vet" all of its caregivers listed on its website, 2018 Form 10-K at 3, and to conduct a "review of all job and profile postings for suspicious or inappropriate content, . . . proactive screening of certain member information against various databases and other sources for criminal or other inappropriate activity, the use of technology to help identify and prevent inappropriate activity through our platform and a safety center that provides resources and information designed to help families and caregivers make more informed hiring decisions." *Id.* at 6.

5.     Care.com, however, misled investors by creating the impression that all job listings were subject to pre-screenings, including criminal background checks when, in fact, Care.com performed criminal background checks and pre-screenings for caregivers only when a customer paid an extra fee for such background screening. As Marcelo admitted to the Wall Street Journal,

in a story published on March 8, 2019, "Care.com is a marketplace platform, like Indeed or LinkedIn. Like those services, we do not generally verify the information posted by users, interview users or conduct employment-level background checks." Marcelo further stated that Care.com relied on a model of "shared responsibility," meaning customers could either conduct their own background checks or pay Care.com to do so.

6.      Moreover, in an attempt to increase the number of listings on, and drive traffic to, its website, Care.com began to unilaterally list day care centers from across the country as providers on its site. Care.com undertook no screening or vetting of any of these day care centers of any kind. The Company simply listed any business it believed to be a day care center on its web site. The day care center could later "claim" its listing and become a Care.com provider.

7.      Prior to the publication of and exposé by the Wall Street Journal on March 8, 2019, which reported on Care.com's vetting practices, Care.com listed over 60,000 such day care centers on its website.

8.      Care.com warned investors about risks to its business including, among others, that "**Our business depends on the strength of our brand. If we are the subject of negative publicity, if the services we provide fail to meet our members' expectations, or if inappropriate actions by certain of our members are attributed to us, or if we are the target of lawsuits or investigations, our brand may be damaged, and we may be unable to maintain or expand our base of members and paying families**." *Id.* at 16 (Emphasis in original.) Not only were Defendants warning investors of the consequences of negative publicity, but they too knew full well the consequences of taking actions that would create negative publicity for the Company.

9.     On Friday March 8, 2019, after the close of trading, the Wall Street Journal published an article titled "Care.com Puts Onus on Families to Check Caregivers' Backgrounds – With Sometimes Tragic Outcomes." The article discussed that the

> Journal found hundreds of instances in which day-care centers appeared to be falsely listed on Care.com as being licensed. The Journal cross-referenced phone numbers, addresses and facility names with records of licensed child-care providers from the five states with the most day-care providers returned by Care.com search results: California, Texas, Pennsylvania, Florida and New York. In Pennsylvania and Florida – the states with the most comprehensive data – a total of nearly 3,000 caregivers were shown on Care.com profiles as licensed by the state. The Journal couldn't locate records for 22% of them in databases maintained by agencies charged with overseeing child-care facilities. The Journal found by contacting day-care centers that some appeared not to exist or not to be aware they were on the site. . . . A spokeswoman said that Care.com, like other companies, adds listing found in 'publicly available data,' and that most day-care centers on its site didn't pay for their listings.

The Journal began contacting Care.com as early as February 2019 about its eventual exposé regarding Care.com's screening and vetting procedures.

10.     On Monday March 11, 2019, before the stock market opened, Care.com issued a Form 8-K in response to the Journal story. The Company disclosed in the 8-K that it would change its caregiver screening practices and will "no longer release any applications or permit those caregivers to send messages on the platform until the completion of its preliminary screening processes." This was an obvious change from how Care.com previously screened applicants.

11.     Additionally, Care.com admitted that it "had used publicly available data to create directory listings for small and medium-sized businesses that provide childcare services. To enhance quality and accuracy of the directory, the Company allowed such businesses to claim ownership over the listings the Company had created. Recently, the Company removed all listings

that had not been claimed. In addition, the Company has made more prominent its notice to users that it does not verify the credentials or licensing information of businesses listed on its consumer marketplace."

12.     Care.com's stock price fell on Monday March 11, 2019 from its prior closing price of $23.41 per share to close at $20.48 per share, a drop of $2.97 per share, or a 12.6% drop.

13.     On Sunday March 31, 2019 the Wall Street Journal further reported that, just before the release of its news story on March 8, 2019 "Care.com . . . removed about 72% of day-care centers, or about 46,594 businesses, listed on its site . . . Those businesses were listed on the site as recently as March 1."

14.     Care.com's stock price fell another $1.31 per share on April 1, 2019, or 6.6%, and fell another $1.81 per share, or another 10% on April 2, 2019 after stock market analyst downgrades of the Company and news that corporate customer Best Buy was suspending its relationship with Care.com and would conduct "a thorough review of both the program and the company."

15.     All totaled, Care.com's stock price fell by $6.09 per share, or 26%, in reaction to the Journals' investigative story, wiping out almost $200 million in market capitalization.

16.     Lead Plaintiff and the class of Care.com investors were misled. Care.com purported to warn investors that "[o]ur business depends on the strength of our brand. If we are the subject of negative publicity . . . our brand may be damaged, and we may be unable to maintain or expand our base of members and paying families." Yet, Care.com failed to inform investors that, despite claiming to be different than the "unsafe" Craigslist, Care.com put itself exactly in the same position by unilaterally listing day-care centers without any vetting, exposing itself to negative publicity and damage to its brand, merely to increase the number of listings on its website.

17.     In other words, Care.com omitted to reveal that it created the very risk of negative publicity it warned investors about when it listed tens of thousands of day-care centers on its website without any vetting or screening. Indeed, once this practice was exposed by the Wall Street Journal—negative publicity—Care.com immediately scrubbed its website and changes it practices.

18.     Additionally, Care.com misled investors as to the pre-screening it conducted of caregivers listed on its website. It misled investors by claiming it had "7 million vetted caregivers" when, in fact, it did not. While Care.com sought to distinguish itself from Craigslist, and portray itself as a website that screens all its caregiver listings, it later admitted that it too is merely an online marketplace like Indeed or LinkedIn (or, indeed, like Craigslist itself). Investors were misled as Care.com claimed to be safer than other online marketplaces and conduct preliminary screenings of caregivers when, in fact, it did not.

19.     Not only did Care.com subsequently admit that it would change its practices and "no longer release any applications or permit those caregivers to send messages on the platform until the completion of its preliminary screening processes," it also failed to reveal that it did allow caregivers to post on its website without preliminary screenings and that its prior screenings and vetting consisted of nothing more than Google searches of an applicant to determine their criminal background, nothing more.

20.     Thus, while Marcelo described Care.com as different than Craigslist, in reality, Care.com was nothing more than Craigslist with an option for consumers to pay more for a real background check. Plaintiff and the class were misled as to the true screening and vetting policies that Care.com implemented and followed during the Class Period.

21.     On May 9, 2019, in response to the Journal articles, Care.com announced that it would now require "in-depth background checks of caregivers and [would conduct] an identity verification pilot." In addition, Care.com announced it was "developing a plan to verify the state licensure information on child-care center listings provided by business owners of such listings . . .". This is in stark contrast to its prior representations as being a safe and secure website and not just another online marketplace.

## Jurisdiction and Venue

22.     The federal claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

23.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

24.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

25.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), as Care.com is headquartered in this District and conducts substantial business here. Additionally, many of the acts and practices complained of herein occurred in substantial part in this District, and witnesses and individual defendants are located in Massachusetts.

26.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

7

to, the mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange.

## Parties

27.     Lead Plaintiff Lesedi Toussaint is an individual residing in Queens, New York. Lead Plaintiff purchased shares of the Company at artificially inflated prices during the Class Period and has been damaged by Company's material misrepresentations and omissions of material facts.

28.     Defendant Care.com, Inc., is incorporated in the State of Delaware and has its headquarters in Waltham, Massachusetts. The Company's stock trades on the New York Stock Exchange under the ticker symbol "CRCM".

29.     Defendant Sheila Lirio Marcelo ("Marcelo") was at all relevant times, Care.com's Founder, Chairwoman, and Chief Executive Officer. Defendant Marcelo signed the 2016, 2017, and 2018 Forms 10-K, as well as the 2Q16, 3Q16, 1Q17, 2Q17, 3Q17, 1Q18, 2Q18, and 3Q18 Forms 10-Q.

30.     Defendant Michael Echenberg ("Echenberg") was Care.com's Chief Financial Officer from April 2015 until his resignation in June 2019. Defendant Echenberg signed the 2016, 2017, and 2018 Forms 10-K, as well as the 2Q16, 3Q16, 1Q17, 2Q17, 3Q17, 1Q18, 2Q18, and 3Q18 Forms 10-Q.

31.     Collectively, Marcelo and Echenberg are referred to throughout this complaint as the "Individual Defendants".

32.     The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual

Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their positions with the Company and access to material non-public information available to them, but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

### Confidential Witnesses

33.     Confidential Witness #1 ("CW1") is a former employee of Care.com who worked as a Member Review Supervisor from August 2016 until April 2017. CW1 reported to Kimmie Rose, Care.com's Director of Customer Operations, who oversaw the Member Review Supervisors. CW1 previously worked as a Care.com Training and Quality Supervisor from April 2015 until August 2016. In that role, CW1 reported to Sara Caputo, Care.com's Training Manager. CW1 also worked as a Care.com Member Care Quality Control Specialist from December 2014 until April 2015, and as a Care.com Member Care Email Representative from February 2012 until December 2014. As a Member Review Supervisor, CW1 regularly conducted reviews of caregivers who listed their services on Care.com.

34.     Confidential Witness #2 ("CW2") was employed at Care.com from March 2011 through June 2019 and held the following positions: 1) Marketing Manager, CRM (Customer Relationship Management), from February 2016 until June 2019; 2) Associate Marketing Manager, from February 2015 until February 2016; 3) Senior Marketing Associate, from August 2014 until February 2015; 4) Marketing Associate: Email Production, from August 2013 until

August 2014; 5) Senior Member Care Representative, from August 2012 until August 2013; and 6) Member Care Representative, from March 2011 until August 2012.

35.     Confidential Witness # 3 ("CW3") was employed as a Care.com Public Relations Manager from May 2014 until January 2015. In that capacity, CW3 reported to Care.com's Corporate Communications Manager and Vice President of Public Relations and Communications.

**Substantive Allegations**

36.     Safety has always purportedly been of paramount concern to Care.com and Marcelo. Along with safety, the breadth of Care.com's vetted caregiver database was core to the Company's success. Examples include:

- "[O]ur business is the largest online database of care seeking families and vetted caregivers with more than 5.3 million families and more tha[n] 4.5 million caregivers worldwide."[1]

- "[W]e believe that we will continue to leverage our 4.7 million vetted caregivers."[2]

- "So 4.7 million vetted caregivers in our database that allows us to provide" a breadth of options to families.[3]

- "We provide a marketplace for those families to find care. And we have a large vetted set of providers in the 4 million range, cumulatively. . . . We pay a lot of

---

[1] February 26, 2014 statement made by Defendant Marcelo on 4Q13 earnings call.

[2] May 1, 2014 statement made by Defendant Marcelo on 1Q14 earnings call.

[3] May 19, 2014 statement made by Defendant Marcelo at JPMorgan Global Technology, Media and Telecom Conference.

attention as new providers are coming in, we vet every provider. We have a team dedicated to vetting new providers and checking out their profile. And we do high-level background checks over certain state and federal databases. . . . [F]or us, safety is really important."[4]

- "And because we have over 4.9 million vetted caregivers, we are the largest in this space fulfilling a need of specific things that families are looking for. And we make it easy and fast to be able to find care."[5]

- "From the very beginning, the team was focused on building a large set of vetted caregivers across the country. . . . [E]arly on the team determined that in order to attract families and have them be willing to pay a subscription, you needed this robust set of providers."[6]

- "With respect to safety and security, it continues to be paramount for us."[7]

- "[A] solution that makes it quick and easy, that wraps it all in a set of guidelines and a set of services that make safety, security, trust, and reliability front and center . . . that to us is what will separate the winners from the others."[8]

---

[4] May 28, 2014 statement made by Care.com's former CFO, John Leahy, at the Raymond James Internet/Software Crossover Conference.

[5] June 3, 2014 statement made by Defendant Marcelo at the Bank of America Merrill Lynch Global Technology Conference.

[6] August 14, 2014 statement made by John Leahy at the Canaccord Genuity Growth Conference.

[7] June 7, 2016 statement made by Defendant Echenberg at the Stifel Technology Internet & Media Conference.

[8] December 5, 2016 statement made by Defendant Echenberg at the UBS Global Media and Communications Conference.

- "[T]here is a level of background checking that we do in every instance when a caregiver joins the platform."[9]

37. Defendants sought to "walk a line" of portraying Care.com as a safer and more secure option than Craigslist or other online listing sites but blurred the line between what Care.com provided as a baseline screening of all caregivers on its web site and what consumers were required to pay for on their own. As stated by CW2, "It really boils down to, if you think of like agencies, caregiver agencies. Their place [is] as an employer to caregivers and they send them out to people who are hiring them and blah, blah, blah. Care.com is not that. They're not an agency. It's a public listing. I always kind of in my head compare it to like a Yelp or like a food delivery service, where restaurants can just list themselves. I can go to Grubhub right now and create a bogus restaurant and say that I deliver hamburgers. **Effectively, that's what the service is on the surface. That's what Care.com is. It's like anyone can go and kind of register an account."**

38. Prior to the start of the Class Period, Care.com sought to distinguish itself from Craigslist and other online classifieds:

- "So the options really for families, especially for moms, our biggest competition is really DoItYourself and Craigslist. And they are fairly unsafe options. . . . And because we have over 4.9 million vetted caregivers, we are the largest in this space fulfilling a need of specific things that families are looking for. . . . Again our biggest competition is DoItYourself and Craigslist. It's my dream hopefully one day to

---

[9] December 5, 2017 statement made by Defendant Echenberg at the UBS Global Media and Communications Conference.

convince Craig to actually take care off of his vertical because it's not as safe. But we will see how he thinks about democratizing content in that way."[10]

- "So care is the most important thing, decision that families are making. . . . Because prior to Care.com, the Yellow Pages are going out of business; they are actually nonexistent anymore. Online classifieds, Craigslist aren't very safe."[11]

39. Defendants continued to distinguish Care.com from Craigslist and other online classifieds throughout the Class Period.

### The False and Misleading Statements

40. On May 23, 2016 Marcelo appeared at a JP Morgan Technology, Media and Telecom Conference and stated that Care.com had "about 7 million caregivers that we have vetted . . . . [W]e continue to invest [in safety] and it has been the baseline product from day one, invested in background checking that include national criminal record [and] sexual offender registry."

41. This statement was materially misleading as it suggested that all 7 million caregivers on the web site were vetted by Care.com. As Marcelo subsequently admitted, this was false as Care.com did not vet all of its caregivers and admittedly did no vetting of the day care centers Care.com itself listed on its web site to generate web site traffic. The 7 million caregivers included the unvetted day care centers.

42. On June 29, 2016, Care.com conducted an investor presentation, which was accompanied by a slide deck highlighting Care.com's current success and future prospects. In the

---

[10] June 3, 2014 statement made by Defendant Marcelo at the Bank of America Merrill Lynch Global Technology Conference.

[11] August 5, 2014 statement made by Defendant Marcelo at the Needham Interconnect Conference.

slide produced below, Care.com purports to inform investors of the Company's advantages over its competitors and alternatives. The last item on the slide is a comparison to online classifieds, which Care.com claims suffer from a "lack of trust and quality" while its platform offers "Trust & Quality."



43.    The image used by Care.com to depict "Online Classifieds" is a computer with the screen set to a page that is nearly identical to the unmistakable home-page for Craigslist. In other words, Care.com purported to differentiate itself from other online websites that simply allow for online ads. Care.com sought to portray itself as providing customers with the trust and quality lacking by Craigslist.

44.    Another slide in the presentation titled "Highlights" purports to inform investors of Care.com's key qualities. With regard to trustworthiness, the slide reads:

| TRUSTED BRAND | Significant brand leadership and trusted platform for growth |
|---|---|

45.     On July 28, 2016, Care.com conducted an investor presentation, accompanied by a slide deck, which contained slides comparing the Company to online classifieds and touting the trustworthiness of Care.com's brand, identical to the slides described in ¶¶ 42-44, above.

46.     On November 1, 2016, Care.com conducted an investor presentation, accompanied by a slide deck, which contained slides comparing the Company to online classifieds and touting the trustworthiness of Care.com's brand, identical to the slides described in ¶¶ 42-44, above.

47.     On December 5, 2016, Defendant Echenberg presented at the UBS Global Media and Communications Conference. In response to a question about how Care.com planned to increase its market share against its competitors, Defendant Echenberg answered in pertinent part:

> Very similar story in family care, where again, we're the largest player in the space. We believe, based on our analysis, that privately held -- that Sittercity is the next largest player, and we believe that they are less than half our size. And then you've got folks like UrbanSitter and Wondersitter, both of which are considerably smaller than SitterCity. They are too happy to take share from them. But the much bigger prize is how we demonstrate that we deliver value above and beyond what you would get trying to do it yourself.

> **You look to classified ads and Craigslist, where the quality control isn't necessarily there**, and the ease of use isn't necessarily there. Of course there are nanny agencies that have much higher price points and more limited selection. And then you've got—a lot of people, particularly before they have kids, and I was in this boat—they think, oh, friends and family. Look at all these people in my life who have kids, and they seem like they're making it all work.

> The thing that you come to realize: even the people who are closest to you, they're probably going to hoard their favorite caregivers because they want them to be available when they need them. And so they are not going to happily hand them over.

> And so a solution that makes it quick and easy, that wraps it all in a set of guidelines and **a set of services that make safety, security, trust, and reliability front and center**; and that delivers value through the match but then beyond the match as well, **that to us is what will separate the winners from the others**.

48. On March 9, 2017, Care.com conducted an investor presentation, accompanied by a slide deck, which contained slides comparing the Company to online classifieds and touting the trustworthiness of Care.com's brand, identical to the slides described in ¶¶ 42-44, above.

49. On March 9, 2017, Care.com filed on Form 10-K with the SEC its annual report for the period ended December 31, 2016, which stated under the subheading "Our Competition":

> With respect to our consumer matching solutions **we compete for members with** traditional offline consumer resources, **online job boards and other online care marketplaces.** We also compete for a share of the overall recruiting and advertising budgets of care-related businesses with traditional, offline media companies and other Internet marketing providers. The principal competitive factors in this market include:
>
> - network size and quality of caregivers and families;
>
> - product reliability, features, effectiveness and efficiency;
>
> - the quality and completeness of family job postings and caregiver profiles;
>
> - product line breadth and applicability;
>
> - affordability and value of the products provided;
>
> - **reliability of safety and security measures**;
>
> - the performance and reliability of a mobile solution;
>
> - international footprint; and
>
> - **brand awareness and reputation**.

> **Our principal competitors in this market are other online care marketplaces**, such as Sittercity and UrbanSitter, **and online classifieds, such as Craigslist.** Our principal competitor in our employer channel is Bright Horizons. In the consumer pay markets, Care.com HomePay competes with similar products offered by 4nannytaxes.com and GTM Payroll Services. **We believe we generally compete favorably with our competitors on the basis of our scale, trusted brand and member experience.**

50.     On May 3, 2017, Care.com conducted an investor presentation, accompanied by a slide deck, which contained slides comparing the Company to online classifieds and touting the trustworthiness of Care.com's brand, identical to the slides described in ¶¶ 42-44, above.

51.     On August 10, 2017, Care.com conducted an investor presentation, accompanied by a slide deck, which contained slides comparing the Company to online classifieds and touting the trustworthiness of Care.com's brand, identical to the slides described in ¶¶ 42-44, above.

52.     On November 2, 2017, Care.com conducted an investor presentation, accompanied by a slide deck, which contained slides comparing the Company to online classifieds and touting the trustworthiness of Care.com's brand, identical to the slides described in ¶¶ 42-44, above.

53.     On February 27, 2018, Care.com conducted an investor presentation, accompanied by a slide deck, which contained slides comparing the Company to online classifieds and touting the trustworthiness of Care.com's brand, identical to the slides described in ¶¶ 42-44, above.

54.     On February 27, 2018, Care.com filed on Form 10-K with the SEC its annual report for the period ended December 30, 2017, which stated under the subheading "Our Competition":

> With respect to our consumer matching solutions **we compete for members with** traditional offline consumer resources, **online job boards and other online care marketplaces.** We also compete for a share of the overall recruiting and advertising budgets of care-related businesses with traditional, offline media companies and other Internet marketing providers. The principal competitive factors in this market include:

- network size and quality of caregivers and families;

- product reliability, features, effectiveness and efficiency;

- the quality and completeness of family job postings and caregiver profiles;

- product line breadth and applicability;

- affordability and value of the products provided;

- **reliability of safety and security measures**;

- the performance and reliability of a mobile solution;

- international footprint; and

- **brand awareness and reputation**.

> **Our principal competitors in this market are other online care marketplaces**, such as Sittercity and UrbanSitter, **and online classifieds, such as Craigslist.** Our principal competitor in our employer channel is Bright Horizons. In the consumer pay markets, Care.com HomePay competes with similar products offered by 4nannytaxes.com and GTM Payroll Services. **We believe we generally compete favorably with our competitors on the basis of our scale, trusted brand and member experience.**

55.     On May 8, 2018, Care.com conducted an investor presentation, accompanied by a slide deck, which contained slides comparing the Company to online classifieds and touting the trustworthiness of Care.com's brand, identical to the slides described in ¶¶ 42-44, above.

56.     On July 30, 2018, Care.com conducted an investor presentation, accompanied by a slide deck, which contained slides comparing the Company to online classifieds and touting the trustworthiness of Care.com's brand, identical to the slides described in ¶¶ 42-44, above.

57.     On November 8, 2018, Care.com conducted an investor presentation, accompanied by a slide deck, which contained slides comparing the Company to online classifieds and touting the trustworthiness of Care.com's brand, identical to the slides described in ¶¶ 42-44, above.

58.     On March 7, 2019, Care.com conducted an investor presentation, accompanied by a slide deck, which contained slides comparing the Company to online classifieds and touting the trustworthiness of Care.com's brand, identical to the slides described in ¶¶ 42-44, above.

59.     On March 7, 2019, Care.com filed on Form 10-K with the SEC its annual report for the period ended December 29, 2018, which stated under the subheading "Our Competition":

> With respect to our consumer matching solutions **we compete for members with** traditional offline consumer resources, **online job boards and other online care marketplaces.** We also compete for a share of the overall recruiting and advertising budgets of care-related businesses with traditional, offline media companies and other Internet marketing providers. The principal competitive factors in this market include:
>
> - network size and quality of caregivers and families;
>
> - product reliability, features, effectiveness and efficiency;
>
> - the quality and completeness of family job postings and caregiver profiles;
>
> - product line breadth and applicability;
>
> - affordability and value of the products provided;
>
> - **reliability of safety and security measures**;
>
> - the performance and reliability of a mobile solution;
>
> - international footprint; and
>
> - **brand awareness and reputation**.
>
> **Our principal competitors in this market are other online care marketplaces**, such as Sittercity and UrbanSitter, **and online classifieds, such as Craigslist.** Our principal competitor in our employer channel is Bright Horizons. In the consumer pay markets, Care.com HomePay competes with similar products offered by 4nannytaxes.com and GTM Payroll Services. **We believe we generally compete favorably with our competitors on the basis of our scale, trusted brand and member experience.**

60.     The statements identified in paragraphs 42 to 59 were false and misleading when made. While Care.com sought to distinguish itself from Craigslist and other online care giver marketplaces because of its commitment to safety and security measures, in fact, as Marcelo admitted, Care.com was just like other online marketplaces, likening Care.com to Indeed and LinkedIn, and conceded that Care.com did not screen all of its caregivers. The Company itself admitted as much when it modified its policies and procedures to require all caregivers be vetted before they could be listed on the Care.com website. The only real difference between Care.com and Craigslist is that Care.com offered a service by which its customers could pay for background checks of caregivers, whereas Craigslist was transparent in its business practices that it did not undertake any vetting or verification of listings on its web site. Defendants misled investors as to the basic vetting procedures utilized by Care.com and when Care.com's actual vetting practices were exposed by the Wall Street Journal, Care.com changed its practices to pre-screen **all** caregivers, greatly increasing its costs, margins and profitability thereby misleading investors.

### The False and Misleading 10-Qs

61.     On July 27, 2016, Care.com filed on Form 10-Q with the SEC its quarterly report for the period ended June 25, 2016, which stated in pertinent part:

> We also serve employers by providing access to certain of our products and services to employer-sponsored families. In addition, **we serve care-related businesses—such as day care centers,** nanny agencies and home care agencies—**who wish to market their services to our care-seeking families** and recruit our caregiver members. These businesses improve our member experience by providing additional caregiving choices for families and employment opportunities for caregivers.

62.     On November 1, 2016, Care.com filed on Form 10-Q with the SEC its quarterly report for the period ended September 24, 2016, which stated in pertinent part:

We also serve employers by providing access to certain of our products and services to employer-sponsored families. In addition, **we serve care-related businesses—such as day care centers**, nanny agencies and home care agencies—**who wish to market their services to our care-seeking families** and recruit our caregiver members. These businesses improve our member experience by providing additional caregiving choices for families and employment opportunities for caregivers.

63.     On May 3, 2017, Care.com filed on Form 10-Q with the SEC its quarterly report for

the period ended April 1, 2017, which stated in pertinent part:

We also serve employers through our Care@Work offering by providing access to certain of our products and services, including back-up care for children and seniors, to employer-sponsored families. In addition, **we serve care-related businesses—such as day care centers**, nanny agencies and home care agencies—**who wish to market their services to our care-seeking families** and recruit our caregiver members. These businesses improve our member experience by providing additional caregiving choices for families and employment opportunities for caregivers.

64.     On August 10, 2017, Care.com filed on Form 10-Q with the SEC its quarterly report

for the period ended July 1, 2017, which stated in pertinent part:

We also serve employers through our Care@Work offering by providing access to certain of our products and services, including back-up care for children and seniors, to employer-sponsored families. In addition, **we serve care-related businesses—such as day care centers**, nanny agencies and home care agencies—**who wish to market their services to our care-seeking families** and recruit our caregiver members. These businesses improve our member experience by providing additional caregiving choices for families and employment opportunities for caregivers.

65.     On November 2, 2017, Care.com filed on Form 10-Q with the SEC its quarterly

report for the period ended September 30, 2017, which stated in pertinent part:

We also serve employers through our Care@Work offering by providing access to certain of our products and services, including back-up care for children and seniors, to employer-sponsored families. In addition, **we serve care-related businesses—such as**

**day care centers**, nanny agencies and home care agencies—**who wish to market their services to our care-seeking families** and recruit our caregiver members. These businesses improve our member experience by providing additional caregiving choices for families and employment opportunities for caregivers.

66.    On May 9, 2018, Care.com filed on Form 10-Q with the SEC its quarterly report for

the period ended March 31, 2018, which stated in pertinent part:

> We also serve employers by providing access to certain of our products and services to employer-sponsored families. In addition, **we serve care-related businesses—such as day care centers,** nanny agencies and home care agencies—**who wish to market their services to our care-seeking families** and recruit our caregiver members. These businesses improve our member experience by providing additional caregiving choices for families and employment opportunities for caregivers.

67.    On July 30, 2018, Care.com filed on Form 10-Q with the SEC its quarterly report

for the period ended June 30, 2018, which stated in pertinent part:

> We also serve employers through our Care@Work offering by providing access to certain of our products and services, including back-up care for children and seniors, to employer-sponsored families. In addition, **we serve care-related businesses—such as day care centers**, nanny agencies and home care agencies—**who wish to market their services to our care-seeking families** and recruit our caregiver members. These businesses improve our member experience by providing additional caregiving choices for families and employment opportunities for caregivers.

68.    On November 8, 2018, Care.com filed on Form 10-Q with the SEC its quarterly

report for the period ended September 29, 2018, which stated in pertinent part:

> We also serve employers through our Care@Work offering by providing access to certain of our products and services, including back-up care for children and seniors, to employer-sponsored families. In addition, **we serve care-related businesses—such as day care centers**, nanny agencies and home care agencies—**who wish to market their services to our care-seeking families** and recruit our caregiver members. These businesses improve our

member experience by providing additional caregiving choices for
families and employment opportunities for caregivers.

69.     Each of the statements identified in paragraphs 61 to 68, in each of the identified

Form 10-Qs, were materially false and misleading when made and/or omitted to disclose material

facts necessary to make the statements made not misleading. Each time Care.com disclosed in its

identified Form 10-Qs that it served "day care centers" "who wish to market their services to our

care-seeking families" it misled investors as it was not the day care centers that wished to market

their services but, instead, Care.com that unilaterally listed the day care centers on its website for

the purpose of increasing the number of listings on its website and generating site traffic. Care.com

omitted to disclose the material facts that none of these day care centers were vetted or screened

by Care.com, despite Defendants repeated statements regarding the importance of safety and how

Care.com was unlike other online listing sites, such as Craigslist, which Defendants characterized

as unsafe and unreliable. In fact, Defendants subsequently admitted, after the Wall Street Journal

investigation, that Care.com listed day care centers on its web site and performed no background

screening or vetting of those sites and, eventually admitted, that it would begin to vet day care

centers for, among other things, state licensures.

### The False and Misleading Form 10-Ks

70.     On March 9, 2017, Care.com filed on Form 10-K with the SEC its annual report for

the period ended December 31, 2016, which stated in pertinent part:

> We have invested in building a differentiated member experience for
> finding and managing care. This investment includes the ongoing
> prioritization of features and processes that we believe contribute to
> the quality of our marketplace. Examples of these investments
> include the review of all job and profile postings for suspicious or
> inappropriate content, tools for members to review and report other
> members, a monitored messaging system that allows members to
> communicate without sharing their personal email, **the proactive**

**screening of certain member information against various databases and other sources for criminal or other inappropriate activity, the use of technology to help identify and prevent inappropriate activity through our platform** and a safety center that provides resources and information designed to help families and caregivers make more informed hiring and job selection decisions [.] We believe these product investments, combined with our investments in national brand advertising and our domain name itself, have established the Care.com brand as a leading and trusted brand for finding care.

(emphasis added).

71.    On February 27, 2018, Care.com filed on Form 10-K with the SEC its annual report

for the period ended December 30, 2017, which stated in pertinent part:

We have invested in building a differentiated member experience for finding and managing care. This investment includes the ongoing prioritization of features and processes that we believe contribute to the quality of our marketplace. Examples of these investments include the review of all job and profile postings for suspicious or inappropriate content, tools for members to review and report other members, a monitored messaging system that allows members to communicate without sharing their personal contact information, **the proactive screening of certain member information against various databases and other sources for criminal or other inappropriate activity, the use of technology to help identify and prevent inappropriate activity through our platform** and a safety center that provides resources and information designed to help families and caregivers make more informed hiring and job selection decisions [.] We believe these product investments, combined with our investments in national brand advertising and our domain name itself, have established the Care.com brand as a leading and trusted brand for finding care.

(emphasis added)

72.    On March 7, 2019, Care.com filed on Form 10-K with the SEC its annual report for

the period ended December 29, 2018, which stated in pertinent part:

We have invested in building a differentiated member experience for finding and managing care. This investment includes the ongoing prioritization of features and processes that we believe contribute to

24

the quality of our marketplace. Examples of these investments include the review of all job and profile postings for suspicious or inappropriate content, tools for members to review and report other members, a monitored messaging system that allows members to communicate without sharing their personal contact information, **the proactive screening of certain member information against various databases and other sources for criminal or other inappropriate activity, the use of technology to help identify and prevent inappropriate activity through our platform** and a safety center that provides resources and information designed to help families and caregivers make more informed hiring and job selection decisions [.] We believe these product investments, combined with our investments in national brand advertising and our domain name itself, have established the Care.com brand as a leading and trusted brand for finding care.

(emphasis added)

73.     In addition, each of the statements identified in paragraphs 70 to 72, in each of the identified Form 10-Ks, that Care.com performed "proactive screening of certain member information against various databases and other sources for criminal or other inappropriate activity, the use of technology to help identify and prevent inappropriate activity through our platform" was materially false and misleading when made. Defendants misled investors as to the basic vetting procedures utilized by Care.com, omitting to disclose that Care.com did allow certain caregivers to list on its web site prior to being vetted and failed to specify that only if customers paid for a comprehensive background check did Care.com provide full background screening including criminal background checks. When Care.com's actual vetting practices were exposed by the Wall Street Journal, Care.com changed its practices to pre-screen **all** caregivers, greatly increasing its costs, margins and profitability thereby misleading investors.

74.     Indeed, Marcelo subsequently admitted that Care.com relied on a model of "shared responsibility" for caregiver vetting with Care.com offering customers the ability to purchase enhanced security screening, and not that Care.com "proactively" screened "member

information against various databases." This type of screening was not proactive but, instead, only if requested and purchased by a family.

75.    Care.com also subsequently admitted, on May 9, 2019, that it would begin to vet potential caregivers through their social security numbers, "in-depth background check[s] that includes federal and county-level criminal records checks dating back seven years. These background checks will be paid for by Care.com . . .".

76.    Finally, CW 1, who worked as a review supervisor from August 2016 through April 2017 said that background checks involving caregivers "was really mostly like Facebook and then they would have a few Google searches of like a person's name plus arrests." Nothing more.

### The False and Misleading Risk Disclosures

77.    Care.com purported to warn its investors about the risk of adverse or negative publicity. As disclosed in its 2017 Form 10-K at 15:

> ***Our business depends on the strength of our brand. If the services we provide fail to meet our members' expectations, or if inappropriate actions by certain of our members is attributed to us, our brand may be damaged, and we may be unable to maintain or expand our base of members and paying families.***
>
> The strength of our brand is essential to our business. Member awareness, and the perceived value, of our brand depends largely on the success of our marketing efforts and the ability of our members to have a consistent, high-quality experience with our service. As a result, we must ensure that our new and existing members are satisfied with our products and services. Complaints, negative views, or negative publicity regarding our products or services, irrespective of their validity, could diminish members' confidence in and the use of our platform and adversely impact our brand. For example, like many subscription businesses, some members make negative comments about the auto-renew nature of our paid subscriptions in online forums and other public venues. In addition, news reports have been published in the past raising concerns about the background check services offered through our platform.

In addition, our member experience extends beyond the products and services that we offer through our website and to the point of service. As a result, inappropriate, illegal or otherwise harmful acts by caregivers or families, even if only by one or a small number of our members and even if such acts are outside of our control, could result in negative publicity or legal action that could have a significant negative impact on our brand. For example, in recent years there has been an increase in fraud perpetrated against caregivers who seek employment on sites such as ours, and Care.com has been featured in news reports regarding these scams. There also have been news reports of alleged criminal conduct by caregivers against families they met through our site, including conduct resulting in death, and in some cases,  lawsuits have been filed against Care.com relating to such conduct. If a decision were rendered against us in a lawsuit of this type, we may incur further negative publicity, incremental costs and this could have an adverse effect on our financial statements. If our efforts to promote and maintain our brand are not successful or if our member experience is not otherwise positive, our operating results and our ability to attract and retain members may be adversely affected.

78.     Care.com similarly purported to warn its investors about the risk of adverse or negative publicity as disclosed in its 2018 Form 10-K at 16:

> ***Our business depends on the strength of our brand. If we are the subject of negative publicity, if the services we provide fail to meet our members' expectations, or if inappropriate actions by certain of our members are attributed to us, or if we are the target of lawsuits or investigations, our brand may be damaged, and we may be unable to maintain or expand our base of members and paying families.***
>
> The strength of our brand is essential to our business. Member awareness, and the perceived value, of our brand depends largely on the success of our marketing efforts and the ability of our members to have a consistent, high-quality experience with our service. As a result, we must ensure that our new and existing members are satisfied with our products and services. Negative publicity, complaints or negative views regarding our products or services, irrespective of their validity, could diminish members' and prospective members' confidence in and the use of our platform and adversely impact our brand. For example, we have in the past been, and may in the future be, the subject of media reports that cast our business practices or the products and services we provide in a negative light. We have been the subject of media reports that have

criticized our ability to detect and remove bad actors from our site. There have also been news reports of alleged criminal conduct by caregivers against families they met through our site, including sexual abuse and conduct resulting in death, and in some cases lawsuits have been filed against Care.com relating to such conduct. In addition, in recent years there has been an increase in fraud perpetrated against caregivers who seek employment opportunities on sites such as ours, and Care.com has been featured in news reports regarding these scams. Regardless of the accuracy of these reports, the validity of their claims or our response, such reports may have the effect of undermining confidence in our brand or increasing the perceived risk of using our services, which could affect our ability to attract and retain paying members and, as a result, negatively impact our results of operations. Even if the effect of such reports on our results of operations is limited, the perception that they could negatively impact our business could cause a decline in the price of our stock disproportionate to the actual harm caused.

79.     There can be no doubt that Defendants were well aware that negative publicity surrounding Care.com, including negative publicity regarding its safety vetting and procedures, would have a negative impact on Care.com and its stock price. Yet, while Defendants purported to warn investors of this risk, these Defendants were putting Care.com in the cross-hairs of the very risk they warned about: adding tens of thousands of unvetted and unscreened day care centers to its web site for the sole purpose of increasing the size of its offerings and web site traffic. This practice made Care.com no different than Craigslist which Defendants repeatedly sought to distinguish themselves from as an unsafe and unreliable classified ad service. Plus, Defendants opened Care.com up to negative publicity by undertaking perfunctory, at best, pre-screening of caregivers on its website. Despite repeated claims of having millions of "vetted" caregivers on its platform, Care.com did not undertake a thorough screening of caregivers but, instead, relied on a model of "shared responsibility," meaning customers could either conduct their own background checks or pay Care.com to do so. The only distinction between Care.com and Craigslist was that Care.com offered to perform the background checks for a fee but, just like Craigslist, did little, if

any, screening of its caregivers. This purported risk disclosure omitted to disclose the material facts that Care.com knew full well that it operated in a manner that would severely harm its value if, and when, the public learned the truth about its business practices.

### The Truth Is Revealed: Care.com Admits Its Prior Screening Practices Were Deficient and It Did Not Screen Day Care Providers

80.    On March 8, 2019, the truth about Care.com's ineffective screening practices began to emerge when the Wall Street Journal published an article titled "Care.com Puts Onus on Families to Check Caregivers' Backgrounds – With Sometimes Tragic Outcomes." The article described how caregivers in the U.S. "who had police records were listed on Care.com and later were accused of committing crimes while caring for customers' children or elderly relatives…" These alleged crimes included theft, child abuse, sexual assault and murder. The article further explained that "Care.com largely leaves it to families to figure out whether caregivers it lists are trustworthy. It does what it calls 'preliminary screening' of them, which isn't a full background check, and doesn't verify credentials. **It does no vetting of day-care centers listed on its site**." (Emphasis added.)

81.    Rebutting any notion that safety is "paramount" to Care.com, the article revealed a deeply disturbing story:

> In Seattle a year ago, police responded to a call saying a babysitter had been stroking the vaginal area and buttocks of a 7-year old girl in his care, police and court records show. The babysitter remained on Care.com's site for weeks, during which time he allegedly also molested a young boy and his friend, based on a second police report.

> On March 28, 2018, Care.com emailed clients who might have used the caregiver, Colin Cutler, saying he had been removed from its website. The email went out about seven weeks after the initial police report.

> Jen Walsh, who had found Mr. Cutler on Care.com and used him to care for her 9-year-old son, overlooked the email, which didn't include Mr. Cutler's name in the subject line and was one of many emails customers receive. The body of the email named him and gave possible reasons for a caregiver to be removed, without saying which if any applied to Mr. Cutler.
>
> Ms. Walsh said she didn't learn of his alleged assaults until she Googled his name months later while looking for his contact information. At that point, local news media had already reported allegations against him.
>
> "I was literally paying [Care.com] every month and they don't even call me about this," Ms. Walsh said.

82.     In contrast to Care.com's repeated claims that it was an industry leader when it comes to safety, the article also revealed that the Company's screening practices fall far short of others:

> Care.com's screening practices set it apart from some companies in the gig economy, in which online platforms connect independent workers with short-term assignments. The dog-walking site Rover, food-delivery startup DoorDash and handyman-finer TaskRabbit all require workers to share their Social Security numbers and pass company-provided background checks before being approved for assignments. Uber Technologies, Inc., which has been the subject of criticism for how it monitors drivers, last year began to include continuing background checks on workers in the U.S. in addition to initial screening.
>
> A firm called CareLinx that focuses on senior care runs background checks on all caregivers, who pay about 20% of the cost, said Chief Executive Sherwin Sheik. The policy "cuts off my growth and the profitability of our company goes down," he said. "It's not cheap." Care.com said CareLinx has a model more like a caregiver agency rather than just a website.

83.     In direct contradiction to the Company's previous claims about the competitive advantages Care.com held over its competitors, including online classified ads and Craigslist, due to the importance of safety and trust—areas where Care.com claimed to be a leader—the Wall

Street Journal article revealed Care.com's response to CareLinx: "Care.com said CareLinx has a model more like a caregiver agency rather than just a website."

84.   With respect to the multitude of crimes and tragedies that users of Care.com's services suffered, the article noted, "**Some incidents sparked conversations among senior employees about the company's approach to background checks, said people close to the company**."

85.   The article also provided: "Ms. Marcelo said Care.com is always looking to improve its processes but has never considered changing its marketplace platform to include running in-depth background checks on all caregivers. She said doing that would mean raising prices and making them too high for many families."

86.   Marcelo is quoted in the Journal article as saying that the Care.com website is designed for "shared responsibility overall," with families having the option to pay for more screening. "Care.com is a marketplace platform, like Indeed or LinkedIn. Like those services, **we do not generally verify the information posted by users, interview users or conduct employment-level background checks**." The Journal article further reported that "Care.com contracts with third-party vendors to do background checks when families order them. Information found in such a check is provided to the family, who can decide whether to share it."

87.   Concerning Care.com's day care center listings, the article revealed:

> The Journal found hundreds of instances in which day-care centers appeared to be falsely listed on Care.com as being licensed. The Journal cross-referenced phone numbers, addresses and facility names with records of licensed child-care providers from the five states with the most day-care providers returned by Care.com search results: California, Texas, Pennsylvania, Florida and New York.

31

> In Pennsylvania and Florida—the states with the most comprehensive data—a total of nearly 3,000 caregivers were shown on Care.com profiles as licensed by the state. The Journal couldn't locate records for 22% of them in databases maintained by agencies charged with overseeing child-care facilities. The Journal found by contacting day-care centers that some appeared not to exist or not to be aware that they were on the site.

88.     On March 11, 2019, prior to the opening of trading, Care.com issued a Form 8-K in which it stated the following:

> While the Company will continue to allow newly-enrolling caregivers to prepare applications to jobs and complete their profiles, the Company is updating its practices to no longer release any applications or permit those caregivers to send messages on the platform until the completion of its preliminary screening processes.
>
> In addition, the Company announced changes to its practices related to small and medium-sized business listings on its consumer marketplace. Like other digital platforms, the Company had used publicly available data to create directory listings for small and medium-sized businesses that provide childcare services. To enhance the quality and accuracy of the directory, the Company allowed such businesses to claim ownership over the listings the Company had created. Recently, the Company removed all listings that had not been claimed. In addition, the Company has made more prominent its notice to users that it does not verify the credentials or licensing information of businesses listed on its consumer marketplace.

89.     Then, on March 31, 2019, the Wall Street Journal published a follow-up article titled "Care.com Removes Tens of Thousands of Unverified Listings." The article reported that its earlier investigation revealed that "hundreds of day-care centers" listed as "state licensed" on the Care.com website did not appear to be, and that about 46,594 or 72% of unverified day-care center listings were scrubbed from the Care.com website just before the March 8, 2019 Wall Street Journal article was published.

90.     The March 8, 2019 Wall Street Journal article revealed that Care.com had received questions from the Journal about its screening and vetting practices as early as February 2019. It is more than a reasonable inference that Care.com scrubbed the massive numbers of unverified daycare centers from its site the day before the article was published in an effort to conceal the fact that they listed tens of thousands of unverified day care centers. Indeed, Care.com made no mention of the removal of the listings in its March 7, 2019 press release announcing its fourth quarter and fiscal 2018 financial results, or its Form 10-K, or its earnings call held that same day. Nor did Care.com explain that the Journal contacted Care.com and was investigating its vetting practices. Only after the Journal's article exposed Care.com did the Company acknowledge the removal of the listings and take remedial actions to respond to its poor or non-existent vetting practices and policies.

91.     Following the release of the Sunday, March 31, 2019, Wall Street Journal article, which revealed that Care.com scrubbed tens of thousands of day care centers from its web site prior to the publication of the March 8, 2019 Journal story, the Company's common stock declined, closing down almost 7%, to close at $18.45 per share on Monday, April 1, 2019.

**Post-Class Period Developments**

92.     On May 9, 2019, Care.com issued a press release, titled "Care.com Enhances Its Caregiver Screening with in-Depth Background Checks and Expands Safety Expertise on Board," stated that it would modify its routing pre-screening background checks:

> **Caregiver Background Checks** - Care.com's longstanding preliminary screening of individual caregivers already includes a search of a national criminal database and the National Sex Offender Public Website. In the next few months, the Company will begin to implement additional screening on caregivers looking to match with families through the platform with the improvements to be rolled out by the end of the year. The enhancements will include:

33

- A Social Security Number verification process for caregivers

- An in-depth background check that includes federal and county-level criminal records checks dating back seven years. These checks, which will be paid for by Care.com, will be conducted by a leading provider of background checks and identity services.

- Displays of the date of the most recent background check on each caregiver's profile

The Company expects to update these caregiver checks annually and will continue to offer additional a la carte background checks for a fee so families can search to get the most current records available. Care.com continues to remind families that running background checks is only one step in their hiring process. The Company encourages its members to visit its Safety Center and review the five-step process for safer hiring.

**Caregiver Identity Verification** - The Company's exploration of identity verification announced in March has resulted in a pilot to be implemented this month and includes facial recognition matched to a government-issued ID. Pending the success of the pilot, the Company will look to expand the use of the technology later this year.

**Child Care Center Vetting** - Care.com is actively developing a plan to verify the state licensure information on child care center listings provided by the business owners of such listings in its free directory. This move follows the Company's announcement in March that it had removed all unclaimed child care center listings from its free digital directory.

93.    In reporting on these changes the Wall Street Journal published another article titled "Child-Care Site Care.com Boosts Vetting After Scrutiny." According to the article, Care.com said it "would pay a provider of background checks and identity services to conduct screening of caregivers on its site, such as verifying their social security numbers and checking for criminal histories." The article also quoted Defendant Marcelo on Care.com's planned safety enhancements: "These investments while substantial in size, are aimed at making our service safer, increasing value to our customers and clients and enhancing the category leadership of our brand,

while ensuring we keep our services affordable for families." Defendant Marcelo's statements establish that Care.com misled investors as to its prior caregiver screening and vetting practices.

94.     Care.com thus changed its business model and dramatically modified its cost structure. Previously, investors were led to believe that Care.com vetted all caregivers before their listing on the web site. Thus, investors priced Care.com stock on the misinformation that consumers were being offered an economical, yet safe, methodology to select caregivers. Instead, investors learned that Care.com was not providing the safety screening and vetting procedures it claimed and that by implementing such procedures, Care.com's costs would increase and profitability decrease, negatively affecting the Company's overall valuation.

95.     On June 25, 2019, Care.com filed on Form 8-K with the SEC a current report, which stated in pertinent part that Defendant Echenberg had tendered his resignation from the Company on June 21, 2019 to be effective on August 30, 2019.

96.     On August 6, 2019, Care.com filed on Form 8-K with the SEC a current report, which stated in pertinent part that Defendant Marcelo would be resigning from her post as Chief Executive Officer of the Company as soon as Care.com found a replacement.

### Additional Scienter Allegations

97.     Marcelo founded Care.com which is a company with one product and one focus: a website that allows consumers to seek caregivers. Marcelo and Echenberg repeatedly touted the safety of Care.com, emphasized how Care.com was different than other online marketplaces due to its safety procedures. Yet, the safety procedures touted by these Defendants were available to consumers who paid extra for them. Without the extra payments, Care.com was just like Craigslist, Indeed and LinkedIn.

98.     As a small company with a singular focus, these two Defendants either knew, or recklessly disregarded, that Care.com did not provide the routine background screening for caregivers that would make Care.com different and distinct from other online marketplace websites. Indeed, CW3 stated that Marcelo was a "very hands on" CEO who worked with Care.com senior management very closely regarding the daily business activities at the Company. CW3 further related that Marcelo's priority was in upholding a positive corporate image, while supporting slipshod business policies at Care.com – "She always stressed to get anybody on the site in any way, shape or form."

### Class Action Allegations

99.     Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired the Company's common stock between May 23, 2016 and April 2, 2019, inclusive. Excluded from the Class are Defendants, directors and officers of the Company, as well as their families and affiliates.

100.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. More than 24 million Care.com shares trade on the New York Stock Exchange.

101.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

      a.   Whether the Exchange Act was violated by Defendants;

      b.   Whether Defendants omitted and/or misrepresented material facts;

c.   Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d.   Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e.   Whether the price of the Company's stock was artificially inflated; and

f.   The extent of damage sustained by Class members and the appropriate measure of damages.

102.   Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

103.   Lead Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Lead Plaintiff has no interests that conflict with those of the Class.

104.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**Loss Causation**

105.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class.

106.   The Friday, March 8, 2019 Wall Street Journal article was published after the market had closed. Care.com shares, which closed trading at $23.41 per share on March 8, 2019,

closed trading on the next trading day, Monday, March 11, 2019, at $20.48, a decline of 12.5%. This decline was attributable to the publication of the Wall Street Journal report.

107.    Following the release of the Sunday, March 31, 2019, Wall Street Journal article, which revealed that "hundreds of day-care centers" listed as "state licensed" on the Care.com website did not appear to be, the Company's common stock declined. Care.com shares, which had closed at $19.76 per share on Friday, March 29, 2019, closed at $18.45 per share on Monday, April 1, 2019, a decline of 6.6%. This decline was attributable to the publication of the Wall Street Journal report.

108.    On Tuesday April 2, 2019 Care.com closed at $16.64 per share, down from its closing price of $18.45 per share on April 1, 2019. This decline was attributable to Care.com being downgraded by analysts because of the scrubbing of day care centers from its web site and the reporting by the Wall Street Journal, and the news that Best Buy was suspending its relationship with Care.com due to the Wall Street Journal's investigative reporting.

**Fraud on the Market Presumption**

109.    Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

    a.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

    b.   The omissions and misrepresentations were material;

    c.   The Company's common stock traded in efficient markets;

    d.   The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e.  Lead Plaintiff and other members of the Class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

110.   At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services; and (iii) the Company was regularly followed by stock market analysts who reported on the events at the Company and the Company's stock price reacted to Company specific news. Lead Plaintiff and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

**No Safe Harbor**

111.   The statutory safe harbor provided for forward-looking statements under certain conditions do not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking when made or were made with knowledge as to their falsity.

112.   To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

**Causes of Action**

**Count I**
**Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

113.     Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

114.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

115.     Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the Class Period.

116.     Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Lead Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**Count II**
**Violation of § 20(a) of the Exchange Act**
**(Against The Individual Defendants)**

117.     Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

118.    The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the documents where false or misleading statements were made and other statements alleged by Lead Plaintiff to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

119.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

120.    As set forth above, Care.com and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

### Prayer for Relief

Lead Plaintiff prays for relief and judgment as follows:

(a) determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a

certification of Lead Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Lead Plaintiff's counsel as Lead Counsel;

(b) awarding compensatory and punitive damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(c) awarding Lead Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

(d) awarding Lead Plaintiff and the other Class members such other relief as this Court may deem just and proper.

### Demand for Jury Trial

Lead Plaintiff hereby demands a trial-by-jury in this action of all issues so triable.

September 16, 2019

Respectfully submitted,

/s/ Jeffrey C. Block
Jeffrey C. Block (BBO #600747)
Jacob A. Walker (BBO #688074)
Nathaniel Silver (BBO #693968)
**Block & Leviton LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
(617) 507-6020 fax
jeff@blockesq.com
jake@blockesq.com
nate@blockesq.com

*Lead Counsel for Lead Plaintiff and the Class*

---

**Certificate of Service**

I, Jeffrey C. Block, hereby certify that a copy of this document will be sent electronically to the registered participants as identified on the Notice of Electronic Filing at the time it is filed through the CM/ECF system on September 16, 2019.

/s/ Jeffrey C. Block
Jeffrey C. Block