UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
                                    )
**LESEDI TOUSSAINT, individually and on** )
**behalf of all other similarly situated,** )
                                    )
            **Plaintiff,**              )
                                    )
            v.                          )    No. 19-cv-10628-DJC
                                    )
**CARE.COM INC.,**                  )
**SHEILA LIRIO MARCELO,**           )
**and MICHAEL ECHENBERG,**          )
                                    )
            **Defendants.**             )
                                    )
                                    )
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                                              **September 25, 2020**

### I.  Introduction

      Plaintiff Lesedi Toussaint, on behalf of a proposed class under Fed. R. Civ. P. 23 (collectively, "Plaintiffs"), sues Defendants Care.com, Inc. ("Care"), Care's founder and former Chief Executive Officer ("CEO") Shelia Lirio Marcelo ("Marcelo") and Care's former Chief Financial Officer ("CFO") Michael Echenberg ("Echenberg") (collectively, "Defendants") alleging securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 ("Rule 10b-5") during the period between May 23, 2016 and April 2, 2019 ("the class period"). D. 19. Defendants have moved to dismiss the amended complaint, D. 23. For the reasons discussed below, the Court ALLOWS Defendants' motion to dismiss.

**II.     Factual Background**

The following factual allegations are taken from the operative pleading, the amended complaint, D. 19, and the Court accepts them as true for the purposes of resolving the Defendants' motion to dismiss.

Plaintiffs are investors who purchased common stock of Care during the class period. D. 19 ¶¶ 1, 27. Care describes itself as "the world's largest online marketplace for finding and managing family care." D. 19 ¶¶ 2 (quoting Care's 2018 Form 10-K).[1] Defendants Marcelo and Echenberg were the CEO and CFO, respectively, during the class period. D. 19 ¶¶ 29, 30. They both signed the 2016, 2017 and 2018 Form 10-K and Form 10-Q reports cited in the amended complaint. Id.

The crux of Plaintiffs' Rule 10b-5 claim against all Defendants (Count I) and their Section 20(a) claim against Marcelo and Echenberg (Count II), is that Defendants made material, false or misleading statements and omissions about the screening they did of care providers listed on their website and how such processes differentiated them from their competitors. D. 19 ¶ 4. Since Defendants only challenge that Plaintiffs have failed to allege plausibly any material false or misleading statements or that the Defendants made them with the requisite scienter, the Court's summary focused on the allegations relating to same.

**A.     Defendants' Allegedly False and Misleading Statements**

As safety was part of Care's purported edge over its competitors, Plaintiffs allege that Defendants made several false and/or misleading statements pertaining to its screening process for

---

[1] As to a motion to dismiss, the Court may consider not just the facts alleged in the complaint, but documents referenced in or attached to same or matters of public record of which the Court may take judicial notice. In re Colonial Mortgage Bankers Corp., 324 F.3d 12, 20 (1st Cir. 2003). Accordingly, this Court has considered Care's quarterly and annual SEC filings as well as its investor presentations and other documents referenced in the amended complaint.

care providers on its website. On the first day of the class period, May 23, 2016, Marcelo and Echenberg both presented at a JP Morgan Media, Technology and Telecom Conference. D. 25-14. There, Marcelo state that Care has "about 7 million caregivers that we have vetted and provide that breadth and access to families" and that the company continues "to invest [in safety] and it has been the baseline product from day one, [we have] invested in background checking that include[s] national criminal record [and] sexual offender registry." D. 19 ¶¶ 3, 40; D. 25-14. Plaintiffs contend that this statement was materially misleading because Care did not vet all of its 7 million caregivers, particularly when its website included unvetted day care centers. D. 19 ¶¶ 41, 80. Defendants made statements in the class period about the screening of caregivers (which, along with families, were called "members") listed on its website. D. 19 ¶¶ 47, 70-72.[2] Consistently, in its 2016, 2017 and 2018 Form 10-K reports (filed on March 9, 2017, February 27, 2018 and March 7, 2019, respectively), Defendants explained that Care engaged in "proactive screening of certain member information against various databases and other sources for criminal or other inappropriate activity [and] the use of technology to help identify and prevent inappropriate activity through its platform and a safety center that provides resources and information designed to help families and caregivers make more informed hiring and job selection decisions." D. 19 ¶¶ 4, 70-73. Plaintiffs contend that these statements by Defendants during the class period were false and misleading because they "create[d] the impression that all job listings were subject to pre-screenings, including criminal background checks when, in fact, Care.com performed criminal background checks and prescreening for caregivers only when a customer paid

---

[2] Plaintiffs rely upon a number of Defendants' public statements before the start of class period on May 23, 2016. See D. 19 ¶¶ 36, 38. Although Plaintiffs contend that reliance upon same is appropriate, at a minimum, to provide context of Defendants' allegedly false and misleading statements during the class period, see, e.g., D. 27 at 8, the Court did not rely upon same in its analysis here.

an extra fee" for same, D. 19 ¶ 5, and Care "undertook no screening or vetting of any of [the] day care centers [that it listed on its site] of any kind." D. 19 ¶ 6. That is, a reasonable investor could have been misled to believe that Care did more screening than it did.

Plaintiffs further contend that the misleading nature of these statements was exacerbated by Care's attempts to distinguish itself from its online competitors (e.g., Craigslist) as a safer alternative for providing family care. D. 19 ¶¶ 18, 20. Defendants made statements distinguishing Care from its competitors at various investors presentations by noting Care's trusted brand, quality and safety. D. 19 ¶¶41–46, 48, 50-60. To such audiences, Care emphasized its trust and quality unlike online classifieds that lacked same. D. 19 ¶ 42, 45-46.

Echenberg echoed this sentiment about Care's trust and quality compared to its online competitors. D. 19 ¶¶ 36 n.8, 47; D. 25-16 at 7. On December 5, 2016, Echenberg presented at the UBS Global Media and Communications Conference. Id. In response to a question about how Care would increase its market share against its competitors, Echenberg stated that when one looks to "classified ads and Craigslist, where the quality control isn't necessarily there . . . a solution that makes it quick and easy, that wraps it all in a set of guidelines and a set of services that make safety, security, trust and reliability front and center; and that delivers value through the match [between family and caregiver] but then beyond the match as well, that to us is what will separate the winners from the others." D. 19 ¶ 47.

### B.     The Wall Street Journal Article

Plaintiffs allege that the false and misleading nature of Defendants' public statements became known on March 8, 2019. On that day, the Wall Street Journal ("the Journal") published an article, "Care.com Puts Onus on Families to Check Caregivers' Backgrounds—With Sometimes Tragic Outcomes," that reported that Care did preliminary screenings of caregivers,

but did not conduct full background checks or verify caregiver credentials. D. 19 ¶ 80; D. 25-21. Regarding day care centers in particular, the Journal noted that Care unilaterally listed day care centers from across the country as providers on its site, did not screen any of the day care centers, and that it had falsely listed day care centers as licensed in hundreds of instances. D. 19 ¶¶ 6-7, 9, 80, 87. As the Journal pointed out, Care "does no vetting of daycare centers listed on its site." D. 19 ¶ 80. The article contrasted Care with several other online services, such as Uber Technologies, Inc. and DoorDash, that did require workers to share their Social Security numbers and pass background checks before being approved for assignments. D. 19 ¶ 82. The article quoted Marcelo who stated that Care had never considered in-depth background checks on all caregivers since doing so would mean raising prices and making them too high for families, that Care is designed for "shared responsibility overall" with families, that families had the option to pay for more screening and that Care was akin to other marketplace platforms like Indeed or LinkedIn, and thus generally did not verify the information posted by users or conduct employment-level background checks. D. 19 ¶ 5; 85-86. Plaintiffs allege that the Journal article laid bare that the only real difference between Care and online classifieds like Craigslist was that Care "offered a service by which its customers could pay for background checks of caregivers whereas Craigslist was transparent in its business practices that it did not undertake any vetting or verification of listings on its website." D. 19 ¶ 60.

### C. The Aftermath of the Wall Street Journal Article

In the aftermath of the Journal article, Care publicly announced that they were taking a number of remedial actions. On March 11, 2019, Care issued a response to the Journal article in a Form 8-K report. D. 19 ¶ 10. Care stated that it would change its caregiver screening practices and would "no longer release any applications or permit those caregivers to send messages on the

platform until the completion of its preliminary processes." Id.  Care noted that it had used "publicly available data to create directory listings for small and medium-sized business[es] that provide childcare services" and "allowed such business to claim ownership over the listings [Care] had created." D. 19 ¶ 11.  Care reported that it had now removed all listings that had not been claimed. Id.  Care also stated that it had made "more prominent its notice to users that it does not verify the credentials or licensing information of businesses listed on its consumer marketplace." Id.  That same day, Care's stock price fell 12.6%.  D. 19 ¶ 12.

On March 31, 2019 in a follow up article, the Journal reported that prior to the publication of its March 8, 2019 article, Care, on notice of the pendency of the publication, had removed about 72% of the day care centers, over 46,594 listings, listed on its site, D. 19 ¶¶ 13, 89-90; D. 25-22, the magnitude of which Care did not mention in its public responses after the publication of the Journal's initial article, even as it had announced the removal of the unclaimed listings.  D. 19 ¶ 90; D. 25-22.  On the following day, April 1, 2019, Care's stock price declined again by 6.6%.  D. 19 ¶ 14.

### III.  Procedural History

Toussaint on behalf of himself and all persons who purchased or otherwise acquired Care's common stock during the class period initiated this action on April 3, 2019 and filed the now operative, amended complaint on September 16, 2019.  D. 1, 19.  Defendants have now moved to dismiss both claims, Counts I and II, in the amended complaint. D. 23.  The Court heard argument on the motion and took the matter under advisement.  D. 29.

### IV.  Discussion

To state a claim under Section 10(b) and Rule 10b-5, Plaintiffs must plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the

misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds, 568 U.S. 455, 460–61 (2013) (internal quotation marks and citation omitted).  The Defendants challenge just the first and second elements; namely, they contend that Plaintiffs have failed to allege material misrepresentations or omissions by Defendants and failed to allege sufficient showing of scienter.  The Court now turns to each of these elements.

### A.     Plaintiffs Has Not Sufficiently Plead Material Misrepresentations and Omissions by Defendants

"To establish a material misrepresentation or omission, [plaintiffs] must show 'that defendants made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading.'" Ganem v. InVivo Therapeutics Holdings Corp., 845 F.3d 447, 454 (1st Cir. 2017) (quoting Geffon v. Micrion Corp., 249 F.3d 29, 34 (1st Cir. 2001)).  Information is material if a "reasonable investor would have viewed it has having significantly altered the total mix of information made available." Mississippi Pub. Employees Ret. Sys. v. Boston Scientific Corp., 523 F.3d 75, 85 (1st Cir. 2008) (internal quotation marks and citation omitted).  "[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor." Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 186-87 (2015).  The allegations in the complaint must also meet the standard under Fed. R. Civ. P. 9(b) and the "heightened pleading requirements" imposed on private securities litigation. Miss. Pub. Employees, 523 F.3d at 85.  "[W]hen alleging that a defendant made a material misrepresentation or omission, a complaint must 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading.'" Id. (quoting 15 U.S.C. § 78u–4(b)(1)).  "Although the pleading requirements in private securities fraud cases are strict,

they obviously do not affect the standard of review for a motion to dismiss." In re Credit Suisse-AOL Sec. Litig., 465 F. Supp. 2d 34, 39 (D. Mass. 2006) (viewing alleged facts in light most favorable to plaintiff). "'In most circumstances, disputes over the materiality of allegedly false or misleading statements must be reserved for the trier of fact.'" Quaak v. Dexia, S.A., 445 F. Supp. 2d 130, 141 (D. Mass. 2006) (quoting Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1217 (1st Cir. 1996)). The problem here is that Plaintiffs has failed to show that the any of the statements alleged are false or misleading.

*1.     Care's Statements Concerning Screening for Caregivers*

Plaintiffs allege that Defendants' statements during the class period that Care screened certain member information against various databases and other sources were false and misleading. D. 19 ¶¶ 70-72. Plaintiffs argue that these statement misled investors "as to the basic vetting procedures utilized by [Care], omitted to disclose that [Care] did allow certain caregivers to list on its website prior to being vetted and failed to specify that only if customers paid for a comprehensive background check did [Care] provide full background screening including criminal background checks." Id. ¶ 73.

But even, as alleged by Plaintiffs, Care did some screening of certain information about caregivers and its statements about the screening it did do was not false. Care screened certain member information against certain, open source information, Id. ¶ 80; D. 25-18 (website), which even one of Plaintiffs' confidential, corporate insiders, CW1, a Care Member Review Supervisor, indicates were the bounds of Care's screening: conduct Facebook searches of caregivers, as well as Google searches for criminal history. Id. ¶ 76. Even in Marcelo's singular statement about Care's "vetting" of its 7 million caregivers, her further statement about security that day echoed Care's consistent statements that families had a shared role in doing so: noting that "the key thing

that we really emphasize to families is we provide these tools and resources for you so that you can make a better informed decision, but we try and encourage families to not take shortcuts and to make sure that they are screening and using the background checks that make them feel comfortable." D. 25-14. Further, Care consistently explained that it conducted "proactive screening of certain member [caregiver] information against various databases and other sources for criminal or other inappropriate activity" and "use[d] technology to help identify and prevent inappropriate activity through [its] platform," D. 19 ¶¶ 70-72 (citing Form 10-K reports). The shared responsibility that families had to vet caregivers they found on Care's platform, as Marcelo referenced in her May 23, 2016 remarks, reflects Care's statements on its website and in its annual and quarterly reports throughout the class period. Care advised families about the steps to ensure safety and security in screening and choosing caregivers, offered an array of background checks that families could request of caregivers if families were willing to pay for additional screening, D. 25-17 (website), and made clear that its platform "allow[s] families to search for, connect with, qualify, vet, and ultimately select caregivers in a low-cost, reliable and easy way." D. 25-4 at 7 (Form 10-K report). In consideration of Marcelo's full statement on May 23, 2016 and the context of Care's public statements about the screening it did for caregivers, Plaintiffs have not shown the excerpt of Marcelo's statement that day was false or misleading. Given the mix of public information available (on Care's website, its Form 10-K and Form 10-Q reports or the full context of Marcelo's statement), a reasonable investor would not have found Marcelo's excerpted statement misleading about the bounds of screening that Care did of caregivers or have assigned greater, qualitative meaning to her use of the term "vetted" in the context of the company's statements, throughout the class period, about this screening. Even if Plaintiffs wish that Care had done more proactive screening, as a necessary predicate to their securities fraud

claim, they have not plausibly alleged that Defendants' public statements regarding its screening of caregivers was false or misleading.

### 2. *Care's Statements Concerning Day Care Centers*

Conflating Care's nomenclature for individual "caregivers" with its for "care-related businesses" (which included daycare centers), Plaintiffs also allege that Defendants made false or misleading statements about the latter because (a) Care did not screen any of the day care centers, (b) Care did not verify that the day care centers listed were state-licensed, and (c) Care unilaterally listed day care centers that did not wish to market their services. D. 19 ¶¶ 9, 40-41, 61-68, 87; D. 27 at 3–4.

These allegations fail as well. First, Defendants never made any statements about screening or vetting daycare centers or other care-related businesses. Care's reports make a distinction between its "members" (i.e., families and caregivers) and the care-related businesses that it served. D. 25-1 at 5. In its various Form 10-Q reports and Form 10-K reports filed during the class period, Care said that "we serve care-related businesses—such as day care centers, nanny agencies and home care agencies—who wish to market their services to our care-seeking families and recruit our caregiver members." D. 19 ¶¶ 61-68 (citing reports filed during class period); D. 25-1 *et seq.* Plaintiffs do not identify any statements in which Defendants claimed the screening or vetting of same. Second, the same is true of the licensure of these care-related businesses. It may have been unwise to post such businesses on its platform without any verification of same, but Plaintiffs fail to point to any statements by Defendants in which they said they had done otherwise. It is the third allegation about care-related businesses that comes closest to amounting to a false or misleading statement. Although Care's Form 10-Q and Form 10-K reports indicated that it served care-related businesses that wished to market its services to Care's families, Care

unilaterally listed such businesses without any consent or input from them. As later revealed, roughly 72% of the day care centers listed on Care's website were allegedly unilaterally placed there and did not give any indication that they wished to use Care's services. The statement was partially true as at least some percentage of the care-related businesses "claimed" their listings on Care, thereby indicating their wish to have their services marketed to Care families. As discussed below, however, even assuming that this third allegation about false or misleading statements about care-related businesses survives, the securities claim has still not been plausibly alleged where Plaintiffs' allegations fail to show a strong inference of scienter.

### 3. *Statements Comparing Care to Competitors*

Not surprisingly, Care publicly compared itself favorably to its competitors. In several investor presentations and in its annual reports during the class period, it did so favorably against online classifieds, such as Craigslist, based on its trusted brand, safety and quality. D. 19 ¶¶ 42-58. It is not merely the assertion that Craigslist and its ilk were Care's competitors, which Plaintiffs do not dispute, but the nature of statements and representations that Care made to distinguish itself from these competitors. D. 27 at 20. Even so, these statements fail to meet the heightened pleading standard that applies here. In its various Form 10-K reports, Care identified its "competition" as "traditional offline consumer resources," but also as "online job boards and other online care marketplaces" and that its competition in these latter categories were Craigslist, and SitterCity and UrbanSitter. D. 19 ¶¶ 49 (citing 2016 Form 10-K filed on March 9, 2017), 54 (citing 2017 Form 10-K report filed on February 27, 2018), 59 (2018 Form 10-K report filed on March 7, 2019). The company listed "reliability of safety and security measures" as one of several principal competitive factors and that it believed that "we generally compete favorably with our competitors on the basis of our scale, trusted brand and member experience." Id. In various investor presentations during

the class period, Care spoke of its advantage over online classified competitors in offering trust and quality that the other services lacked. D. 19 ¶¶ 42-46, 48, 50-53, 55-58. Defendant Echenberg echoed this theme at several conferences. Id. ¶ 36 (citing June 7, 2016 statement that safety and security "continues to be paramount for use" and a statement at a December 5, 2017 conference that "there's a level of background checking that we do in every instance when a caregiver joins the platform"). These statements (and even the graphics that accompanied the statements) were generalized statements regarding trust, security and reputation that are generally not actionable. NPS, LLC v. Ambac Assur. Corp, 706 F. Supp. 2d 162, 173 (D. Mass. 2010) (discussing cases in which statements regarding quality, management practice and/or security were not mere puffery and were actionable and distinguishing same where general statements of opinion about the quality of service were not actionable). To the extent that they were more than corporate puffery, cf. In re Petrobras Sec. Litig., 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (concluding that "[w]hile some of the alleged statements, viewed in isolation, may be mere puffery, nonetheless, when (as here alleged) the statements were made repeatedly in an effort to reassure the investing public about the Company's integrity, a reasonable investor could rely on them as reflective of the true state of affairs at the Company" and declining to conclude that defendants' alleged statements regarding general integrity and ethical soundness were immaterial as a matter of law), and were accompanied by comparisons to competitors, even those comparisons were not particularized. Although Care's comparison with online classifieds contended that it offered greater trust and quality, it did not identify what services, screening or otherwise, Care offered that the online classifieds did not. As Defendants' counsel suggested at oral argument, Craigslist set a 'low bar' in this regard and Plaintiffs have not alleged how Care's statements of comparison was false and misleading even if their screening of caregivers was more cursory than Plaintiffs would have desired.

### *4. Risk Disclosures Not Actionable*

The Court also does not conclude that Defendants' "risk disclosures" are actionable. As alleged, in its Form10-K reports during the class period, the statements that Care's brand could be impacted by negative publicity, inappropriate and/or criminal behavior by its member caregivers or lawsuits or investigations of the company, were false and misleading because Care failed to disclose that it was operating in a manner that would open Care up to said negative publicity. Id. ¶¶ 77-79. "A forward-looking warning . . . could be regarded as misrepresentation if it warns only against future risks and implies that such risks are not immediately foreseeable and considerably certain." Pyramid Holdings, Inc. v. Inverness Medical Innovations Inc., 638 F. Supp. 2d 120, 125 (D. Mass. 2009). Such is not the case here as to these statements. In these statements, Care noted, among other things, that it had already been the subject of media reports that cast its services in a negative light and that "[t]here have also been news reports of alleged criminal conduct by caregivers against families they met through our site." D. 19 ¶¶ 77-78. As these were risks that Care had already faced and would be facing does not make the statements misleading or false. Even accepting Plaintiffs' allegations about the other material misrepresentations and omissions as true, the Court fails to see how Care's statement that they had and could be subject to financial risk if they were subject to negative publicity in the past (true as it had been in the past) or as it could be in the future (true) is false or misleading. Plaintiffs are correct that the other alleged misrepresentations or omissions could lead to a different cause for adverse publicity (and resulting impact on financial condition), but that does not make these statements of risk untrue or misleading.

### B.     **Plaintiffs Have Not Sufficiently Plead Scienter**

Even assuming *arguendo*, that Plaintiffs have shown any actionable statements, dismissal is still warranted here for the failure of their allegations to give rise to a strong inference of scienter on Defendants' part.  In a securities fraud case, plaintiffs must "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  Greebel v. FTP Software, Inc., 194 F.3d 185, 194 (1st Cir. 1999) (quoting 15 U.S.C. § 78u–4(b)(2)).  Scienter, "'embracing intent to deceive, manipulate or defraud,' may be shown where the defendants consciously intended to defraud, or that they acted with a high degree of recklessness."  Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002) (internal citations omitted).  The Supreme Court has construed the PSLRA's requirement to plead facts giving rise to a "strong inference" of scienter to mean that "a complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007).  Thus, in evaluating a securities class action complaint, courts "must take into account plausible opposing inferences."  Id. at 323.  "[W]here there are equally strong inferences for and against scienter, Tellabs now awards the draw to the plaintiff."  ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 59 (1st Cir. 2009).  This is necessarily a fact-specific inquiry, Greebel, 194 F.3d at 196; Aldridge, 284 F.3d at 82, which may rely upon indirect evidence of scienter, Greebel, 194 F.3d at 202, but the inference may not just be a reasonable one, but a strong inference of scienter.  In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 195 (1st Cir. 2005) (internal quotation marks omitted) (quoting In re Cabletron Systems, Inc., 311 F.3d 11, 38 (1st Cir. 2002)).  Courts conducting such an inquiry must determine "whether <u>all</u> of the facts alleged, taken collectively,

give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, 551 U.S. at 323 (emphasis in original).

Based upon the totality of the circumstances, the Court concludes that Plaintiffs have not made a showing of a strong inference of scienter as to each of Defendants here. First, the Court has considered the statements, as summarized above, made by Care, but also by Marcelo as its CEO and Echenberg as its CFO. Statements alone may not be sufficient in every case for giving rise to a strong inference of scienter. Aldridge, 284 F.3d at 83. Even if they could be, they are not so here where only one statement could arguably be said to be false or misleading. Even as to the statement about the listing of care-related businesses that wanted to market their services, this statement was in part true (as to the businesses that claimed their listings). Such statement alone does not rise to the level of strong scienter, particularly as to the individual Defendants. Even considering that Care is a company with a single product or service (i.e., its website platform) and that it might be reasonable to assume that its CEO and CFO would be intimately familiar with its core operations, see, e.g., In re Zillow Group, Inc. Sec. Litig., 17-1387-JCC, 2019 WL 1755293, at *20 (W.D. Wash. Apr. 19, 2019); Azar v. Yelp, Inc., No. 18-cv-00400-EMC, 2018 WL 6182756, at *20 (N.D. Cal. Nov. 27, 2018); cf. In re Biogen Inc. Sec. Litig., 857 F.3d 34, 44 (1st Cir. 2017) (noting that it would not reach whether "core operations" allegations may give to a strong inference of scienter), such assumption does not seem reasonable here where care-related business was less than .5% of Care's total revenue. D. 24 at 19-20. Second, although both individual Defendants held positions that would have given them access to and familiarity with Care's operations and they signed annual and quarterly reports as discussed above, see In re PerkinsElmer, 286 F. Supp. 2d at 55-56, corporate leadership positions alone are not enough to create a strong inference of scienter. Coyne v. Metabolix, Inc., 943 F. Supp. 2d 259, 272 (D. Mass.

15

2013) (citing Lirette v. Shiva Corp., 27 F. Supp. 2d 268, 283 (D. Mass. 1998)); see Maldonado v. Dominguez, 137 F.3d 1, 9-10 (1st Cir. 1998). Third, Plaintiffs' reliance on company insiders, CW1, CW2 and CW3, does not add much to the mix for a showing of a strong inference of scienter. None of the three confidential sources, were direct reports to the individual Defendants or provide evidence about the falsity of their public statements (or their reckless disregard for the falsity of same). None of them offer any statements as to Echenberg and the observation that Marcelo was a "hands on" CEO offers little to bolster the dearth of allegations giving rise to a strong inference of scienter. The assertion of CW3, previously employed as Care's Public Relations Manager from May 2014 until January 2015, that Marcelo was concerned with increasing the sheer number of members on the Care platform, D. 19 ¶ 35, 98, is not compelling even when considered in conjunction with Care's scrubbing its site of the unclaimed daycare center listings on the eve of the Journal's publication of its initial article. This is particularly true when viewed against the opposing inferences that Defendants point to here. Those inferences—that, in the wake of the Journal's investigation, Care made remedial actions and statements as reasonable business actions in response to adverse publicity and that there were inherent, but disclosed, risks involved in its business model, as highlighted by the Journal's article—are more cogent and compelling, particularly where there otherwise are none of the typical indicia of scienter, like evidence of insider trading or personal gain, contradictory internal documents or the like, see Greebel, 194 F.3d at 196. Although any draw between equally compelling inferences goes to a plaintiff, ACA Fin. Guar. Corp., 512 F.3d at 59; see In re PerkinsElmer, 286 F. Supp. 2d at 55, such is not the case here where the more compelling inference is the one opposed to the one Plaintiffs would have the Court draw.

For all of these reasons, the Court allows the motion to dismiss Count I against each of the Defendants.

### C. Section 20(a) Claim (Count II)

As to the individual Defendants, Plaintiffs also assert a claim, Count II, under the theory of control person liability pursuant Section 20(a) of the Exchange Act. In relevant part, Section 20(a) provides that "[e]very person, who, directly or indirectly, controls any person liable under any provision of this title or any rule or regulation thereunder shall also be liable jointly and severally . . . ." The elements for a Section 20(a) claim are "(i) an underlying violation of the same chapter of the securities laws by the controlled entity . . . ; and (ii) control of the primary violator by the defendant[s]." Quaak, 445 F. Supp. 2d at 146. For the reasons discussed above, the Court concludes that Plaintiffs have not sufficiently pled that Care, the controlled entity, violated Section 10(b) and Rule 10b-5. Accordingly, since the underlying violation fails, the Section 20(a) claim also fails. In re Wayfair, Inc. Sec. Litig., 19-10062-DPW, 2020 WL 3840904, at *13 (D. Mass. Jul. 8, 2020).

## V. Conclusion

For the foregoing reasons, the Court ALLOWS the Defendants' motion to dismiss, D. 23.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

17